# United States Court of Appeals
# For the Ninth Circuit

————◆————

————◆————

JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated,

Plaintiff-Petitioners,

v.

ELI LILLY AND COMPANY,

Defendant-Respondent.

## FED. R. CIV. P. 23(f)
## PETITION FOR PERMISSION TO APPEAL

**BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.**
MICHAEL L. BAUM
R. BRENT WISNER
BIJAN ESDANDIARI
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 207-4204
MBaum@BaumHedlundLaw.com
RBWisner@BaumHedlundLaw.com

**KELLER ROHRBACK L.L.P.**
MICHAEL D. WOERNER
BENJAMIN GOULD
GRETCHEN FREEMAN CAPPIO
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile (206) 623-3384
mwoerner@kellerRohrback.com
gcappio@kellerrohrback.com
bgould@kellerrohrback.com

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-petitioners Jennifer L. Saavedra, Dr. Melissa Strafford, Carol Jacquez, and David Matthews, Jr. are natural persons. As such, a corporate disclosure statement is not required. Fed. R. App. P. 26.1(a).

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT................................................................. i

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ................................................................1

QUESTIONS PRESENTED................................................................2

FACTUAL AND PROCEDURAL BACKGROUND ................................................................3

I.      The Lawsuit ................................................................3

II.     Procedural Background ................................................................4

III.    The District Court's Denial of Class Certification ................................................................7

DR. HAY'S DAMAGE MODELS................................................................7

REASONS WHY THIS PETITION SHOULD BE GRANTED ................................................................8

I.      The District Court's Denial of Class Certification Sounds the Death
        Knell to Plaintiffs' Consumer Protection Claims and Is Riddled
        with Questionable Rulings and Findings of Fact ................................................................9

        A.      The District Court Erroneously Construed One of Plaintiffs'
                Damage Models to Be Abandoned and Ignored the
                Possibility of Statutory Damages, Even Though *Both* Were
                Briefed ................................................................9

        B.      The District Court Abused its Discretion by Forcing Class
                Certification without Any Meaningful Discovery, Initial
                Disclosures, or Even an Answer to the Complaint ................................................................11

        C.      In Evaluating Causation, the District Court Failed to Cite
                California, Massachusetts, Missouri, and New York's
                Consumer Protection Law and, Thus, Applied the Wrong
                Causation Standard................................................................13

D.    The District Court Applied the Wrong Standard in Evaluating Plaintiffs' Proposed Damage Models and, in So Doing, Misapprehended Basic Pharmaceutical Economics ................14

E.    The District Court's Reason for Denying an Issue Class Runs Afoul of *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014) ..................................................................................................18

II.    The District Court's Denial of Class Certification Raises Unsettled and Fundamental Issues of Law Relating to Class Actions .........................19

CONCLUSION .................................................................................................20

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................21

CERTIFICATE OF SERVICE .............................................................................22

EXHIBITS……………………………………………………………………...51

<u>TABLE OF AUTHORITIES</u>

Page(s)

**<u>Cases</u>**

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*
 133 S. Ct. 1184(2013) ...........................................................................15

*Butler v. Sears, Roebuck & Co.*
 727 F.3d 796 (7th Cir. 2013) ..............................................................1

*Chamberlan v. Ford Motor Co.*
 402 F.3d 952 (9th Cir. 2005) ................................................................9

*Comcast Corp. v. Behrend,*
 185 L. Ed. 2d 515 (2013) ....................................................... 2, 15, 19

*Guido v. L'Oreal, USA, Inc.*
 2013 WL 3353857 .............................................................................11

*Hess v. Chase Manhattan Bank, USA, N.A.*
 220 S.W.3d 758 (Mo. 2007) ...............................................................14

*In re ConAgra Foods, Inc.*
 302 F.R.D. 537 (C.D. Cal. 2014) ........................................................13

*In re Steroid Hormone Prod. Cases*
 104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010) ........................................14

*In re Tobacco II Cases*
 207 P.3d 20(Cal.2009)………………………………………………13

*Jimenez v. Allstate Ins. Co.*
 765 F.3d 1161 (9th Cir. 2014) ................................................. 2, 18, 19

*Leyva v. Medline Indus., Inc.*
 716 F.3d 510 (9th Cir. 2013) .................................................... 14, 15

*Lilly v. Jamba Juice Co.*
 2014 WL 4652283, at *11 (N.D. Cal. Sept. 18, 2014). .......................20

iv

*Navellier v. Sletten*
   262 F.3d 923(9th Cir. 2001) ..................................................................9

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*
   647 N.E.2d 741 (N.Y. 1995)...............................................................14

*Perez v. Safelite Grp. Inc.*
   553 F. App'x 667 (9th Cir. 2014) ......................................................12

*Plubell v. Merck & Co.*
   289 S.W.3d 707 (Mo. Ct. App. 2009)...............................................13

*Rahman v. Mott's LLP*
   2014 WL 6815779, at *9 (N.D. Cal. Dec. 3, 2014)...........................20

*Smilow v. Sw. Bell Mobile Sys., Inc.*
   323 F.3d 32 (1st Cir. 2003)................................................................10

*Stearns v. Ticketmaster Corp.*
   655 F.3d 1013 (9th Cir. 2011) …………………………………………13

*Stutman v. Chem. Bank*
   731 N.E. 2d 608(N.Y.2000)………………………….…………….………...13

*Tyler v. Michaels Stores, Inc.*
    984 N.E. 2d 737(Mass.2013)…………………………..……………………13

*Vaccarino v. Midland Nat. Life Ins. Co.*
   2014 WL 572365, at *12 (C.D. Cal. Feb. 3, 2014).. .................................. 14, 19

*Werdebaugh v. Blue Diamond Growers*
   WL 7148923, at *14 (N.D. Cal. Dec. 15, 2014)................................20

## Other Authorities

*Comcast Corp v Behrend and Chaos on the Ground*
   81 U. Chi. L. Rev. 1213, (2014)……………………………………………19

## <u>R**ULES**</u>

Fed. R. Civ. P. 23(b)(3)............................................................................1

Fed. R. Civ. P. 23(c)(4)............................................................................1

Fed. R. Civ. P. 23(c)(5)............................................................................5

Fed. R. Civ. P. 23(f)................................................................................1

Fed. R. Civ. P. 26(a)(2)(A)......................................................................12

Fed. R. Civ. P. 26(a)(2)(B)......................................................................12

Mass. Gen Laws ch. 93A ………………………………………………10

N.Y. Gen. Bus. Law § 349(h)..................................................................11

<u>PRELIMINARY STATEMENT</u>

Since 2004, Defendant Eli Lilly and Company ("Lilly") misrepresented the risk of suffering from withdrawal symptoms upon discontinuing Cymbalta, warning patients that the risk of suffering withdrawal was "greater than or equal to 1%." All the while, Lilly knew the actual withdrawal risk was *at least* 44%, and likely much higher. Cymbalta's warning is misleading—carefully crafted to conceal the fact that most people who start Cymbalta *will* suffer withdrawal if they ever stop. This misleading warning, coupled with a lack of Cymbalta-specific information about the frequency, severity, or duration of withdrawal, violated consumer protection law in California, Massachusetts, Missouri, and New York.

This petition seeks permission to appeal, pursuant to Fed. R. Civ. P. 23(f), the lower court's order denying certification of a consumer class under Fed. R. Civ. P. 23(b)(3) and a liability-only class under Fed. R. Civ. P. 23(c)(4). Rule 23(f) appeals are warranted when (1) the denial of class certification effectively ends the litigation and contains "questionable" rulings and (2) when the certification order raises unsettled and important questions of law related to class actions. Both apply.

*First*, the court's denial of class certification "sounds the death knell" of Plaintiffs' claims—"[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Thus, the issue turns on whether the court's order is "questionable." As described below, the district court's order is burdened with errors:

- The district court disregarded one of Plaintiffs' proposed damage models and ignored Plaintiffs' request for statutory damage classes in Massachusetts and New York;

- The district court abused its discretion by forcing Plaintiffs to move for class certification without any meaningful discovery, initial disclosures, or even an answer to the complaint;

- The district court did not consider the underlying consumer protection laws of California, Massachusetts, Missouri, and New York, and applied the wrong causation standard;

- The district court applied the wrong standard in evaluating Plaintiffs' proposed damages model by inappropriately *and incorrectly* delving into the merits of the model;

- The district court's reason for denying an issue / liability-only class was not valid under this Court's recent decision *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014), and was not based on any "rigorous" analysis.

*Second*, the district court's order raises two very important and unsettled questions of law that impacts nearly all class actions. First, the question of what role a district court should play in evaluating a damages model under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013). Some courts circumscribe their role to evaluating whether the proposed damage model is tethered to the alleged theory of liability. The district court here, however, took it further, asserting that it must evaluate the "persuasiveness" of the model as part of its "rigorous" analysis. Second, the order raises a question of when it is appropriate for a district court to certify an issue / liability-only class, and when a denial of such a motion constitutes an abuse of discretion. Both of these questions are integral to class certification, and both are suited for resolution here.

## QUESTIONS PRESENTED

1. Does the district court's denial of class certification, which effectively ends the litigation, contain "questionable" rulings and findings of fact to warrant appellate review under Federal Rule of Civil Procedure 23(f)?

2. Does the district court's denial of class certification raise unsettled and

fundamental issues of law related to class actions so as to warrant appellate review under Federal Rule of Civil Procedure 23(f), to wit:

a. What role should a district court play in evaluating a proposed damages model at the class certification stage?

b. When is it appropriate to certify a liability-only class under Federal Rule of Civil Procedure 23(c)(4)?

FACTUAL AND PROCEDURAL BACKGROUND

## I.     The Lawsuit

In the 1990s, Lilly researched negative symptoms associated with stopping or tapering off antidepressants, i.e., antidepressant withdrawal, in an effort to promote Prozac.  (*See* First Glenmullen Decl. ¶¶ 27-29, D.Ct. Dkt. 80.)   Lilly researchers asserted that the shorter a drug's half-life, i.e., the time it takes for half of a drug to leave a person's body, the more pronounced the withdrawal symptoms.  (*Id.*) Since Prozac had a long half-life, Lilly claimed it was a superior antidepressant. However, Lilly faced a problem when it came time to launch Cymbalta in 2004— Cymbalta's half-life is extremely short (twelve hours).  Thus, instead of being honest with consumers, Lilly concealed Cymbalta's actual withdrawal risk.  The Cymbalta label warns that the risk of withdrawal is "greater than or equal to 1%." (*Id.* ¶¶ 12-17.)  This language suggests a relatively low risk, i.e., around 1%. However, Lilly's clinical trials indicate that the risk is *at least* 45%.  (*Id.* ¶ 19.)

In addition, Lilly told consumers that "[d]uring marketing of other [antidepressants] . . .  there have been spontaneous reports of adverse events occurring upon discontinuation . . . Although these events are generally self-limiting, *some* have been reported to be severe." (FAC ¶ 28.).  This, again, misstated what Lilly knew because, according to Lilly's own evaluations, 10% to

17% of Cymbalta users suffered *severe* withdrawal symptoms and most lasted longer than two weeks. (Glenmullen Decl. ¶¶ 18-21.)

Plaintiffs allege that Lilly marketed Cymbalta to consumers without accurately disclosing the frequency, severity, and duration of withdrawal, and this conduct violated the consumer protection statutes of California, Massachusetts, Missouri, and New York. (FAC ¶¶ 22-43, 85-137.) Using half-truths and vague language, Lilly hid the fact that most people who start Cymbalta *will* suffer withdrawal.

## II.    Procedural Background

The First Amended Complaint was filed on December 14, 2012 (D.Ct. Dkt. 42). Instead of answering the complaint, Lilly filed a motion to dismiss. (D.Ct. Dkt. 46.) On February 26, 2013, the district court ruled on the motion, dismissing Plaintiffs' claims for declaratory and injunctive relief, but leaving the remaining claims intact. (D.Ct. Dkt. 52.). Before entering any scheduling order, the district court invited Lilly to file a motion for summary judgment. (D.Ct. Dkt. 51.) Plaintiffs requested the opportunity to conduct discovery to oppose summary judgment, but the district court denied the request and instructed Plaintiffs to file a Rule 56(d) motion as needed. After Lilly filed its motion for summary judgment, Plaintiffs filed an opposition *and* Rule 56(d) motion seeking targeted discovery on issues raised in Lilly's motion. (*See* D.Ct. Dkts. 59 & 60.) The district court issued an order indicating it would only be deciding a legal issue, so Plaintiffs did not need discovery. (D.Ct. Dkt. 65 at 3.)

The parties briefed the legal issue and, on June 13, 2013, the district court issued a ruling. (D.Ct. Dkt. 72, attached as Exh. B.) The district court, however,

did not deny or grant the motion for summary judgment, noting that before the district court could rule, Plaintiffs would need *some* discovery. (*Id.* at 6.) The district court then, *sua sponte*, raised the issue of class certification, commenting that class treatment was unlikely.[1] (*Id.* at 6-8.) The district court then ordered the Plaintiffs—without any discovery, initial disclosures, or even an answer to the complaint—to move for class certification within one month. (*Id.* at 8.)

Faced with an apparent prejudgment concerning class certification, Plaintiffs complied with the order and promptly moved for class certification. Mindful of the district court's commentary, Plaintiffs filed two motions. (D.Ct. Dkts. 73, 74, 75-83.) The first motion sought certification of a traditional consumer class under Rule 23(b)(3) for consumers in California, Massachusetts, Missouri, and New York. (D.Ct. Dkt. 73.) The second motion sought certification of an issue class under Rule 23(c)(5) and focused on the issue the district court identified as suitable for class-wide resolution, i.e., "whether or not the warnings given to doctors, and consumers, were inadequate or misleading." (D.Ct. Dkts. 72 at 7, attached as Exh. B.) The motions were accompanied by four declarations from experts. (D.Ct. Dkts. 75-83.) One of the declarations was from Joel W. Hay, PhD ("First Hay Decl."), a pharmaceutical economist and tenured professor at the University of Southern California's School of Pharmacy. (D.Ct. Dkt. 83, attached as Exh. C.) His declaration outlined ways to calculate damages using "conjoint analysis."[2]

---

[1] The district court commented that "[a]lthough the question of whether or not the warnings given to doctors, and consumers, were inadequate or misleading may be capable of resolution on a class-wide basis, the question of whether or not, had the warnings been adequate, each plaintiff would not have taken Cymbalta are not." (D.Ct. Dkt. 72 at 7.)

[2] Conjoint analysis is described in detail in the next section.

Lilly filed oppositions to class certification but did not provide any expert testimony. (D.Ct. Dkts. 84 & 85.) At the hearing on September 17, 2013, the district court challenged Lilly for not submitting any evidentiary support and ordered Lilly "to submit a supplemental brief with accompanying exhibits that describes the evidentiary support for its position[.]" (D.Ct. Dkt. 89.) Lilly then submitted a supplemental brief and included with it several expert declarations. Plaintiffs filed a response which included a second declaration by Dr. Hay ("Second Hay Decl.") (D.Ct. Dkt. 96, attached as Exh. D.) The second declaration responded to several questions raised during the hearing and noted that none of Lilly's experts challenged Dr. Hay's proposed damage models. (*See id.* ¶¶ 7, 24.)

The district court then held another hearing. Once again, the district court invited Lilly to submit additional evidence to rebut Plaintiffs' proposed damages model. The district court also ordered specific briefing on:

> (1) the distinction between price and value in connection with conjoint analysis; (2) the relationship, if any, between the learned intermediary doctrine and conjoint analysis; (3) the feasibility of using conjoint analysis to prove liability on a class-wide basis; and (4) whether conjoint analysis would lead to a uniform method of measuring damages.

(D.Ct. Dkt. 99 at 1-2.) Recognizing that Lilly had previously published conjoint studies of its products, the district court allowed limited discovery related to Lilly's use of conjoint analysis with Cymbalta and allowed the deposition of Dr. Hay. (*Id.*)

Following a limited document production (nine documents) and the depositions of Dr. Hay and Lilly's new conjoint analysis expert Yoram Wind, PhD, Lilly filed another supplemental brief on March 3, 2014. Plaintiffs responded on March 31, 2014, attaching a third declaration from Dr. Hay ("Third Hay Decl."), addressing,

in detail, the issues raised by the district court and correcting Dr. Wind's various misstatements about the conjoint method. (*See* Third Hay Decl. ¶¶ 50-64.)

On December 18, 2014, the district court issued an order denying both motions for class certification ("Cert. Order"). (D.Ct. Dkt. 150, attached as Exh. A).

## III. The District Court's Denial of Class Certification

The district court denied Plaintiffs' first motion to certify, i.e., a liability and damages class, based solely on its review of the requirements set forth by Rule 23(b)(3). Specifically, the district court held that: (1) the Plaintiffs' proposed damages models were flawed and damages could not be "feasibly and efficiently calculated" once liability was established (Cert. Order at 11); (2) "Plaintiffs failed to establish how causation could be proven on a classwide basis" (*id.* at 14); and the class action mechanism was not superior to individual lawsuits because the proposed "class action would be unmanageable." (*Id.* at 15.)

Regarding Plaintiff's second motion for class certification, i.e., certification of a pure liability class, the district court also denied certification because "certification of an issue class would not advance the resolution of litigation." (*Id.* at 17.)

<u>DR. HAY'S DAMAGE MODELS</u>

Dr. Hay proposes using "conjoint analysis" as a method to calculate the damages in this case. According to Dr. Hay:

> Conjoint ("**con**sider **joint**ly") analysis is a type of survey market research that has been used by researchers for over four decades to determine how consumers place value on specific attributes of products, often called the market's willingness to pay ("MWTP"). . . In the healthcare sector, conjoint analysis uses a systematic approach to efficiently assess treatment preferences and how these preferences are altered by differences in treatment efficacy and adverse effects.

. . . [C]onjoint analysis conceptualizes products as bundles of attributes, such as price, to compare how a consumer values particular aspects of a product over others. Using specialized consumer surveys, conjoint analysis forces consumers to make tradeoffs over attributes, which allows researchers to see how consumers comparatively value a particular aspect of a product. . . .

(First Hay Decl. ¶¶ 16-19.) Dr. Hay describes, in detail, the steps associated with conducting a conjoint study, (*see* Third Hay Decl. ¶¶ 12-25), and how he would be able to "determine the relative value to consumers of both high (44%) and low (1%) levels of withdrawal risk[.]" (Second Hay Decl. ¶ 16.) Dr. Hay explains:

Using the above conjoint analysis, the economic loss suffered by each consumer of Cymbalta can then be computed in an objective, common manner. The relative value measured by the conjoint analysis can be expressed in **absolute terms** or as **a percentage** (ratio).

In absolute terms, the conjoint analysis will determine the dollar amount that consumers are willing to pay for a particular attribute (i.e., the MWTP). Damages for each consumer would then be that amount up to the amount of their actual out-of-pocket expenses.

Alternatively, the relative value determined through conjoint analysis can be expressed as a percentage, yielding a refund ratio. This refund ratio would then be applied uniformly to each class member's total out-of-pocket expenses. . . .

(Second Hay Decl. ¶¶ 18-22 (emphasis added).)

## REASONS WHY THIS PETITION SHOULD BE GRANTED

The district court's denial of class certification presents an excellent vehicle for interlocutory review. Interlocutory review is most appropriate when:

(1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous.

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam).

The first two categories (and by extension, the third) apply here.

## I. The District Court's Denial of Class Certification Sounds the Death Knell to Plaintiffs' Consumer Protection Claims and Is Burdened with Questionable Rulings and Findings of Fact

The district court's denial of class certification effectively ends this litigation for the Plaintiffs. As the district court noted, the amount of recovery at issue for each Plaintiff is very small. (Cert. Order at 15.) Absent a class, the costs of litigating Plaintiffs' consumer protection claims far outweigh any possible recovery. *Chamberlan*, 402 F.3d at 957. Thus, the issue here is not whether the district court's denial of class certification sounds the death knell of this litigation—because it does—but whether the district court's denial is "questionable." *Chamberlan*, 402 F.3d at 959. Such an inquiry "normally would look for error in the certification order." *Id.* at 960. And, as detailed below, the district court's ruling contains several errors warranting appellate review.

### A. The District Court Erroneously Construed One of Plaintiffs' Damage Models to Be Abandoned and Ignored the Possibility of Statutory Damages, Even Though *Both* Were Briefed

The district court erred by failing to consider (1) a damage model proposed by Dr. Hay and (2) the possibility of statutory damages in Massachusetts and New York, even though both were submitted as part of class certification briefing. "While the trial court has broad discretion to certify a class, its discretion must be exercised[.]" *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001).

#### (1) The District Court Refused to Consider Dr. Hay's Alternative Approach to Calculating Damages

The district court stated, in a footnote:

> Dr. Hay also mentions measuring damages as the dollar amount of the
> consumers' willingness to pay for a drug with 1% withdrawal risk
> rather than 44% withdrawal risk, up to the amount of the class
> member's out-of-pocket costs.  *See* (Second Hay Decl. ¶ 19).  Because
> neither party focuses on this measure and because it was seemingly
> abandoned in Dr. Hay's third declaration, the Court declines to
> address it.

(Cert. Order at 7 n.6.)  Plaintiffs never abandoned this model—Lilly just never

challenged it.  Plaintiffs' second brief reads:

> The difference in value can be expressed in one of two ways: 1)
> through a refund ratio or percentage, whereby every consumer will be
> entitled to a certain percent of the amount he or she spent on
> Cymbalta, or 2) through an absolute value, measuring the dollar
> amount a reasonable consumer assigns to the particular attribute. (*Id*.
> at ¶¶ 19-21.)

(D.Ct. Dkt. 94 at 16.)  Plaintiffs therefore proposed the "absolute value" approach

for calculating damages.  Dr. Hay's third declaration and Plaintiff's third

supplemental brief do not further discuss this approach because those filings were

made *in response* to Lilly's third round of briefing and the district court's minute

order.  (*See* D.Ct. Dkt. 99 at 1.)  Since the district court did not order further

briefing on this and Lilly never challenged it, there was no need to discuss it again.

This, however, was not an *abandonment* of the approach.

### (2) The District Court Did Not Address the Possibility of Statutory Damages for the Massachusetts and New York Classes

In addition to ignoring Dr. Hay's alternative damages approach, the district

court also ignored Plaintiffs request for statutory damages in the Massachusetts and

New York classes.  In Massachusetts, if damages are not ascertainable, a putative

class can receive the statutorily prescribed minimum of $25 each.  Mass. Gen Laws

ch. 93A; *e.g.*, *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 42 (1st Cir. 2003).

The same applies in New York, except the statutorily prescribed minimum is $50. N.Y. Gen. Bus. Law § 349(h); *e.g.*, *Guido v. L'Oreal, USA, Inc.*, No. CV 11-1067 CAS JCX, 2013 WL 3353857, at *16 (C.D. Cal. July 1, 2013). Plaintiffs requested a statutory damages class in the initial motion for class certification and in the final brief submitted to the Court. (D.Ct. Dkts. 73 at 22 n.15; Supplemental Br. in Sup. of Pla's Mot. for Class Cert. at 30 (Mar. 31, 2014), attached as Exh. F.) The district court, however, completely ignored the request.

### B. The District Court Abused its Discretion by Forcing Class Certification without Any Meaningful Discovery, Initial Disclosures, or Even an Answer to the Complaint

The district court's denial of class certification must be understood within the procedural posture the district court created. The district court relied on several procedural "facts" to support its rulings—"facts" that are demonstrably false.

First, the district court criticized Dr. Hay's proposed damages model because Dr. Hay had not yet performed the proposed conjoint study or collected any data, indicating that "Plaintiffs have done worse than not even advancing a reliable method of calculating damages—they have advanced 'no damages model at all.'" (Cert. Order at 10-11.) This is not accurate. On June 13, 2013, the district court, *sua sponte*, ordered Plaintiffs to move for class certification by August 19, 2013, giving Plaintiffs one month to prepare a viable damages model without *any* discovery, initial disclosures, or even an answer to the Complaint. Thus, Dr. Hay *proposed* a method for calculating damages using conjoint analysis based on the allegations in the Complaint and his expertise—performing an actual conjoint study takes months and requires *some* factual discovery. The district court,

however, never allowed such discovery, limiting Lilly's document production to examples of Lilly's use of conjoint analysis with Cymbalta. Using the fact that Dr. Hay had not yet conducted the study as a reason for rejecting his proposal, when the district court effectively prevented Plaintiffs from being able to conduct such a study in the first place, constitutes an abuse of discretion.

Second, the district court denied Plaintiff's motion for an issue class under Rule 23(c)(4) because "Plaintiffs have already engaged in extensive litigation" and "have already engaged in substantial discovery, including expert disclosures." (Cert. Order at 17.) This is not true. Expert disclosures were *never* made under Rule 26(a)(2)(A) and expert reports were *never* created or exchanged under Rule 26(a)(2)(B). The district court expressly forbade general discovery from the outset and allowed only very limited discovery on the issue of conjoint analysis during the third round of briefing. Characterizing such discovery as "substantial" is incorrect. Leading up to class certification, there had been no Rule 16 scheduling order, no initial disclosures, no discovery, and no answer to the complaint. This procedural posture did not provide "ample opportunity" to press class certification.

When a district court refuses to allow discovery despite repeated requests, fails "to set an initial scheduling conference" and then uses the fact that the class certification was not substantiated with evidence to deny certification, that conduct "constitutes an abuse of discretion." *Perez v. Safelite Grp. Inc.*, 553 F. App'x 667, 668 (9th Cir. 2014). It is an abuse of discretion to force Plaintiffs to file and move for class certification without *any* meaningful discovery and then use the "lack of evidence" as grounds for denying certification.

**C. In Evaluating Causation, the District Court Failed to Cite California, Massachusetts, Missouri, and New York's Consumer Protection Law and, Thus, Applied the Wrong Causation Standard**

The district court held that "Plaintiffs fail to show that classwide proof of causation is appropriate in this case[,]" reasoning that "the causal effect of Lilly's alleged misstatements will differ wildly between individuals." (Cert. Order at 13.) Thus, according to the district court, it is "inappropriate to assume that because the alleged misstatement would be important to a reasonable person that it must have induced Plaintiffs to purchase Cymbalta[.]" (*Id.*) Absent from the district court's analysis of causation, however, is citation to the underlying consumer laws.[3] (*See id.* at 11-14.) Had the district court examined the underlying law, it would have realized it was applying the *wrong* standard. None of the states at issue require a showing that the misrepresentations or omissions induced each consumer to purchase the product.[4] The district court's imposition of an improper reliance requirement was, thus, an abuse of discretion.

In the four states at issue, proof of classwide causation does not hinge on

---

[3] The district court relies heavily on *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) to support its various positions, including the inability of Plaintiffs to prove classwide causation. (See Cert. Order at 4, 11, 14, 15.) That reliance, however, appears to be misplaced. On November 24, 2014, the court issued a tentative ruling, indicating it would, after all, certify ten state consumer classes, essentially reversing its ruling in *ConAgra*. *See* Brandon Lowrey, Classes Get Tentative OK In ConAgra 'Natural" Oil Actions, Law360, Nov. 24, 2014, *available at* http://www.law360.com/articles/599090/classes-get-tentative-ok-in-conagra-natural-oil-actions.

[4] In Missouri, a causal relationship between the alleged omissions and a plaintiff's purchase is not required. *Plubell v. Merck & Co.*, 289 S.W.3d 707, 714 (Mo. Ct. App. 2009). A plaintiff need only show a connection between the deception and the loss. *Id.* Similarly in Massachusetts, there is no requirement for individual causation—a plaintiff need only show that a consumer's loss was the result of a deceptive practice. *Tyler v. Michaels Stores, Inc.*, 984 N.E.2d 737, 745 (Mass. 2013). The same applies to New York. *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612-13 (N.Y. 2000). And, in California, although the class representative must establish that they personally relied on the misrepresentation or omission in making the purchasing decision to have standing, *see In re Tobacco II Cases*, 207 P.3d 20, 39-40 (Cal. 2009), "[c]ausation, on a classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011).

whether the deception caused the purchase.  Instead, to establish causation, Plaintiffs need only show that the omission was *material*, i.e., that a *reasonable consumer* would have considered the information important in making a purchasing decision; an issue nicely suited for class resolution.[5]  *In re Steroid Hormone Prod. Cases*, 104 Cal. Rptr. 3d 329, 338 (Cal. Ct. App. 2010); *Aspinall*, 813 N.E.2d at 488; *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 773 (Mo. 2007); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995).  Thus, the district court's insistence that the alleged misrepresentation "must have induced Plaintiffs to purchase Cymbalta" is error.  (Cert. Order at 13.)  The underlying consumer statutes do not require such proof.  The district court applied the *wrong* standard.

### D. The District Court Applied the Wrong Standard in Evaluating Plaintiffs' Proposed Damage Models and, in So Doing, Misapprehended Basic Pharmaceutical Economics

The district court took it upon itself to not only evaluate whether the Plaintiffs' proposed damages model was tethered to a theory of liability, but actually weighed the merits of the proposed damages model, inserting the court's own ideas about economics.  This was another error.  *See, e.g.*, *Vaccarino v. Midland Nat. Life Ins. Co.*, No. 2:11-CV-05858-CAS, 2014 WL 572365, at *12 (C.D. Cal. Feb. 3, 2014).  *Comcast* stands for the proposition that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."  133 S. Ct. at 1433; *Leyva v. Medline Indus., Inc.,* 716 F.3d 510, 514 (9th

---

[5] Plaintiffs submitted expert testimony that "greater than or equal to 1%" was material and, thus, suitable for classwide proof.  (*See* First Glenmullen Decl. ¶¶ 19-27; Second Glenmullen Decl. ¶¶ 2-4, 11-16, 19 (D.Ct. Dkt. 92).)

Cir. 2013). *Comcast*, however, does not "require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable 'on a class-wide basis.'" *Leyva*, 716 F.3d at 514. *Comcast* created no *new* requirements for class certification. *Comcast*, 133 S. Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting); *see Leyva*, 716 F.3d at 514. Thus, in evaluating a motion for class certification, the district court's job is to rigorously examine whether the proposed method for calculating damages "stemmed from the defendant's actions that created legal liability," *Leyva*, 716 F.3d at 514, not to weigh the model's merits.

Here, the district court stated that "Rule 23(b)(3)'s predominance requirement also requires the moving party to show that 'damages are capable of measurement on a classwide basis" and that district courts "must assess the persuasiveness of the evidence" in calculating damages. (Cert. Order at 4, 5.) This is not correct. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). Since *Comcast* only requires that a proposed damages model be linked to the alleged injury, which Dr. Hay's analysis does, the district court abused its discretion by injecting its own views on pharmaceutical economics.

The insertion of the district court's views on economics thereby led to further errors. The district court held that Dr. Hay's proposed analysis is flawed because the value a consumer places on a particular attribute of a drug is not tethered to that

drug's fair market value. (Cert. Order at 8.).[6] In other words, there is no reason to believe that changing an attribute of a drug would affect the *fair market value or price* of the drug. (Id. at 8-9.) And, absent a connection between the misrepresented attribute, i.e., the risk of withdrawal, and fair market value or price, damages are not calculable. (*Id.*) The problem with this interpretation is that it assumes that all damages must be associated with fair market value or price—a requirement not found in any of the underlying consumer protection statutes. And, more importantly, this view misapprehends basic pharmaceutical economics:

> [I]n the pharmaceutical industry, there is no "market price" for a drug.
> . . This means that to ascertain the potential damages in this case, I
> will need to examine the economic loss from the consumer's
> perspective (ground up) instead of the market's perspective (top
> down). That leads to the concept of value.
>
> Value, unlike price, is a measure from the consumer's perspective.
> Also called "utility" or "welfare," value is ***a measure of the benefit a
> reasonable consumer believes he or she will obtain by the use or
> ownership of a product***. . . . Since value is independent from price
> and does not need a competitive market to exist, it is well suited for
> consideration of how consumers, as opposed to the market, appreciate
> a product and all of its various attributes. . . .
>
> Here, consumers were allegedly misled about a material aspect of
> Cymbalta by being told that the risk of withdrawal was "greater than
> or equal to 1%" when the risk was actually at least 44%, if not higher.
> . . . [T]he beauty of conjoint analysis is that we can *directly* measure

---

[6] The district court creates a term "consumer value" and characterizes it as a "subjective concept distinct from the fair market value concept[.]" (Cert. Order at 7.) This use of the word "subjective" reveals a fundamental misunderstanding by the district court. Consumer value is not any more "subjective" than fair market value. Both consumer value and fair market value are monetary amounts based on an averaging of preferences expressed through transactions—one uses sales data to arrive at an average price, the other uses data obtained through the conjoint survey to arrive at the market willingness to pay (MWTP) or "consumer value." Both yield "objective" measures that are subject to validation checks. And, although each uses different data, they arrive at the same point, i.e., the value of a given product with a given attribute. This is why, in a perfectly competitive marketplace, willingness to pay obtained through a conjoint study would equal the fair market value or price. (*See* Second Hay Decl. ¶¶ 11-15.) Economically they are both objective measures of the value consumers place on an attribute. (*Id.* ¶ 15.)

> how much value consumers place on the different levels of with-
> drawal risk. Generally, price is a proxy for value. In the prescription
> drug market, price is not an accurate proxy for value. With conjoint
> analysis, we are not limited to the proxy – we can go *directly* to value.

(Third Hay Decl. ¶¶ 8-12.) Conjoint analysis, thus, is a tool that generates an

*objective* measure of the value a reasonable consumer places on a specific attribute

in a non-competitive marketplace—comparable to the way price reflects that same

value in a competitive one. The district court's insistence that all damage

calculations be tied to price or fair market value, even in the pharmaceutical

context, is misplaced. The court's refusal to accept Dr. Hay's testimony, therefore,

is simply an effort to supplant Dr. Hay's expertise with its own.[7]

The district court made another error in criticizing the application of a "refund

ratio" to a consumer's out-of-pocket expenses. The district court argues that

applying a refund ratio to a consumer's out-of-pocket costs is improper because a

consumer's out-of-pocket costs "are not a proxy for the value of Cymbalta was

represented." (Cert. Order 8-9.) Thus, the district court incorrectly concludes that

"applying a refund ratio to that consumer's [out-of-pocket cost] does not yield an

accurate approximation of the difference between the consumer's subjective

valuation of the drug as represented and the drug as actually received." (*Id.* at 9.)

This argument, however, misapprehends Dr. Hay's proposed model. The money a

consumer spends on Cymbalta reflects a decision by the consumer that the

---

[7] Later, the district court analogizes conjoint analysis to "relying on proof of the personal injuries incurred by the average car accident victim to show that a particular car accident cause that same amount of harm to a particular victim." (Cert. Order at 14.) This is *non sequitur*. Conjoint analysis does not render an estimation of average disappointment with a product, i.e., their "personal injury." Conjoint analysis allows Dr. Hay to determine, based on the data generated through a conjoint exercise, how much the market's willingness to pay was inflated due to the misrepresentation. This measure is as objective as the district court's "fair market value" concept, which is nothing more than an average of what many different consumers paid for a product.

purported benefits of the product outweigh the cost.[8]  Thus, at the point of sale, a

bargain is struck whereby the consumer believes he or she will obtain a certain

value in purchasing the product.  If, however, the purported benefits are

misrepresented, causing the product to be overvalued, the consumer will not get

the benefit of *that* bargain.  Conjoint analysis objectively determines how much the

bargain was overvalued by a reasonable consumer—the standard employed by the

consumer protection statutes at issue—and, thus, reflects a real world

determination of the loss caused by the omission.  It does not "yield[] an arbitrary

amount that is unrelated to the amount of harm [.]"  (Cert. Order at 9.)

## E. The District Court's Reason for Denying an Issue Class Runs Afoul of *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014)

Plaintiffs filed a motion to certify an issue class under Rule 23(c)(4) to

determine, on a class-wide basis, "whether Lilly's omissions regarding Cymbalta

were materially misleading under the state laws of Missouri, New York,

Massachusetts, and California."  (D.Ct. Dkt. 74 at 3-4.).  This motion was based on

the district court's prior statement that "the question of whether or not the warnings

given to doctors, and consumers, were inadequate or misleading may be capable of

resolution on a class-wide basis."  (D.Ct. Dkt. 72 at 7, attached as Exh. B.)  Indeed,

for purposes of class certification, the district court expressly told the parties to

"assume that Plaintiffs will be able to prevail on their contention that the warnings

---

[8] As Dr. Hay explains:  "Underlying this approach [refund ratio] is an assumption that comes directly from basic economic principles:  when a reasonable consumer buys a drug, he or she believes that the benefits of the drug outweigh the risks.  Thus, any money spent by the consumer, whether it is the full price or as part of a co-pay, was spent based on an overall valuation of the medication. Since that valuation was inflated by a certain percent, i.e., the refund ratio, it makes sense to refund that percent to the consumer."  Third Hay Decl. ¶ 57(c).

given to physicians were inadequate"—the very issue Plaintiffs wanted to certify. (*Id.* at 8.)  In support of the motion, Plaintiffs submitted expert testimony from Professor Alexandra D. Lahav about how, procedurally and legally, certification and resolution of an issue / liability class would materially advance this litigation as a whole. (D.Ct. Dkt. 82 ("Lahav Decl.").)

Ignoring Lahav's declaration, the district court held that "certification of an issue class would not advance the resolution of this litigation" because "Plaintiffs fail to show that damages can be determined even on an individual basis once liability is decided." (Cert. Order at 16.)  This is the *wrong* standard.  The inability to ascertain damages is not a valid ground to defeat certification of an issue class. *Jimenez*, 765 F.3d at 1167. "So long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed did not defeat class certification." *Id.*  The district court's refusal to certify an issue class based on inability to calculate damages is "a *per se* abuse of discretion."  *Id.*

## II.    The District Court's Denial of Class Certification Raises Unsettled and Fundamental Issues of Law Relating to Class Actions

*First*, courts take different positions about what role they should play in evaluating a proposed damages model in light of *Comcast*.  *See* Alex Parkinson, *Comcast Corp v Behrend and Chaos on the Ground*, 81 U. CHI. L. REV. 1213, 1213-59 (2014).  For example, in *Vaccarino*, the court refused to consider the merits of a proposed damages model because "*Comcast* requires that courts determine whether damages are susceptible of classwide measurement, not whether that measurement is precisely correct." 2014 WL 572365, at *12.  The court refused to "engage in a 'free-ranging merits inquir[y]'—an inquiry that

would require this Court to, in effect, fully adjudicate the substance of plaintiffs' allegations" and, instead, limited its examination to ensuring that the damages model was properly tethered to the theory of liability. *Id.* at *11-13. This is in stark contrast to the district court here, which weighed the persuasiveness of Dr. Hay's proposed damage models. (Cert. Order at 5); s*ee Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923, at *14 (N.D. Cal. Dec. 15, 2014). Absent some guidance from this Court, district courts will continue to apply varying levels of scrutiny to proposed damage models.

*Second*, courts are not clear about when it is appropriate to certify an issue class under Rule 23(c)(4) and when a district court abuses its discretion in denying such certification. Compare *Lilly v. Jamba Juice Co.*, No. 13-CV-02998-JST, 2014 WL 4652283, at *11 (N.D. Cal. Sept. 18, 2014) (granting issue class) *with Rahman v. Mott's LLP*, No. 13-CV-03482-SI, 2014 WL 6815779, at *9 (N.D. Cal. Dec. 3, 2014) (denying availability of issue class); (*see also* Cert. Order at 16.) The district court cited various considerations such as the existence of a summary judgment ruling, the volume of discovery and litigation, and whether the plaintiff had an opportunity to present a damage model, speaking to the *ad hoc* nature of the analysis. Absent direction from this Court, courts will continue to struggle with certifying issue classes, leading to a non-uniform application of law and consumers without a remedy for conduct deemed improper by their state legislatures.

## CONCLUSION

For the foregoing reasons, the Court should grant this petition and allow Plaintiffs to file an appeal of the district court's denial of class certification.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,027 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in Times New Roman, 14-point font.

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed **FED. R. CIV. P. 23(f) PETITION FOR PERMISSION TO APPEAL** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 2, 2015. I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Clara J. Shin,
E-mail: cshin@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111

Mark H. Lynch
E-mail: mlyncb@cov.com
Michael X. Imbroscio
E-mail: mimbroscio@cov.com
Phyllis A. Jones
E-mail: paJones@cov.com
Colleen A. Kelly
E-mail: ckelly cov.com
COVINGTON & URLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004

*Attorneys for Defendant Eli Lilly and Company*

/s/ R. Brent Wisner
R. Brent Wisner

# EXHIBITS

EXHIBIT A –     ORDER DENYING PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 23(b)(3) OR 23(c)(4)

EXHIBIT B –     MINUTE ORDER, DOCKET 72, UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT C –     DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (FIRST HAY DECL., DKT. 83)

EXHIBIT D –     DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION (SECOND HAY DECL., DKT. 96)

EXHIBIT E –     SUPPLEMENTAL DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF RE. CONJOINT ANALYSIS (THIRD HAY DECL., *SUBMITTED UNDER SEAL*)

EXHIBIT F –     SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION (*SUBMITTED UNDER SEAL*)

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|---|---|---|---|

| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. |
|---|---|

Present: The Honorable    STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**     IN CHAMBERS ORDER Re MOTION FOR SUMMARY JUDGMENT [54] [65]

Upon review of the parties' briefs, the Court concludes that the Motion is suitable for determination without oral argument. Fed. R. Civ. P. 78(b); Local Rule 7-15. The hearing scheduled for June 17, 2013, is VACATED.

## I. INTRODUCTION AND BACKGROUND

On January 10, 2013 Plaintiffs Jennifer Saavedra, Melissa Strafford, Carol Jacquez, and David Matthews, Jr. (collectively, "Plaintiffs") filed their corrected First Amended Complaint ("FAC") against Defendant Eli Lilly and Company ("Defendant"). (Dckt. 44.) In their FAC, Plaintiffs asserted claims on behalf of themselves and all similarly situated individuals under the consumer protection laws of four different states (the "class claims"): California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ et seq., False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; Massachusetts's Consumer Protection Act ("Ch. 93A"), Mass. Gen. Laws Ch. 93A, §§ 1, et seq.; Missouri's Merchandising Practices Act ("MPA"), Mo. Rev. Stat. §§ 407.010, et seq.; and New York's Consumer Protection from Deceptive Acts and Practices Law ("NYCPA"), N.Y. Gen. Bus. Law §§ 349, et seq.[1] Plaintiff Saavedra also asserted five individual causes of action for breaches of express and implied warranty, unjust

---

[1] Plaintiffs Saavedra and Jacquez are residents of California; Plaintiff Matthews, a resident of Missouri; and Plaintiff Strafford is currently a resident of New York, but was also a resident of Massachusetts during the time period relevant to this suit.

| | : |
|---|---|
| Initials of Preparer | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|---|---|---|---|

| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. |
|---|---|

enrichment, strict products liability, and negligence, each arising under California law.  Plaintiffs requested monetary damages and declaratory and injunctive relief.

In their FAC, Plaintiffs alleged that Defendant developed and manufactures the antidepressant Cymbalta.  FAC ¶ 22.  They further alleged that users who take Cymbalta are "faced severe physiological and psychological symptoms when the attempt to stop" taking it, including dizziness, nausea, headache, fatigue, paresthesia, vomiting, irritability, nightmares, insomnia, diarrhea, anxiety, hyperhidrosis, and vertigo (the Court refers to these symptoms as "Cymbalta withdrawal").  FAC ¶ 26.  Each prescription of Cymbalta includes a label that warns about Cymbalta withdrawal.  FAC ¶ 28.  The label informed the reader that "[f]ollowing abrupt or tapered discontinuation in placebo-controlled clinical trial, the following symptoms occurred at a rate greater than or equal to 1% and at a significantly higher rate in duloxetine [i.e. Cymbalta]-treated patients compared to those discontinuing from placebo: dizziness, headache, nausea, diarrhea, paresthesia, vomiting, insomnia, anxiety, hyperhidrosis, and fatigue."  FAC ¶ 28.  The label further informed the reader that there have been reports of "adverse events" upon discontinuation of *other* SNRIs, including irritability, dizziness, anxiety, headache, and others.  FAC ¶ 28.[2]

Plaintiffs allege that this label did not accurately inform consumers "and healthcare professionals" of the "frequency, severity, and/or duration of Cymbalta withdrawal."  FAC ¶ 27.  According to Plaintiffs, various studies dating back to at least 2005 have found that between 44 and 50 percent of all Cymbalta users experience Cymbalta withdrawal; and of those, approximately half experience "moderate" or "persistent" symptoms, and one in ten will experience "severe" symptoms.  FAC ¶¶ 30, 33.  Moreover, "nowhere on Cymbalta's label does it indicate the potential duration of withdrawal symptoms."  FAC ¶ 32.  Each Plaintiff alleges that, had they known the truth about the frequency, severity, and duration of Cymbalta withdrawal, they would not have started taking Cymbalta.  FAC ¶¶ 8-13.

On February 26, 2013, this Court dismissed Plaintiffs' claims for injunctive and declaratory relief, but otherwise denied the Defendant's motion to dismiss.  This Court subsequently instructed the parties to brief solely the legal question of whether the learned intermediary doctrine applies to the consumer protection claims at issue in this case.

---

[2] This warning has undergone "minor variations" since Cymbalta's approval in 2004.  FAC ¶ 2.

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|---|---|---|---|
| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. | | |

## II. DISCUSSION

### A. Application of the Learned Intermediary Doctrine

The learned intermediary doctrine provides that a drug manufacturer cannot be liable for failing to warn the ultimate consumer of potential side-effects of prescription medication, so long as adequate warnings are given to the prescribing physician.  See Motus v. Pfizer Inc. (Roerig Div.), 358 F.3d 659, 661 (9th Cir. 2004) ("[Defendant] is obligated to warn doctors, not patients, of potential side-effects associated with its pharmaceutical products[.]").  As the Second Circuit has explained:

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient.  His is the task of weighing the benefits of any medication against its potential dangers.  The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

Plummer v. Lederle Laboratories, Div. of Am. Cyanamid Co., 819 F.2d 349, 356 (2d Cir. 1987) (internal citations and quotation marks omitted); see also Cottam v. CVS Pharmacy, 436 Mass. 316, 321 (2002) ("The rationale for the [learned intermediary] doctrine is that physicians have the duty to inform themselves about the drug and warn their patients as they deem necessary.  Physicians, after considering the history and needs of their patients and the qualities of the drug, are required to inform their patients of those side effects they determine are necessary and relevant for patients to know in making an informed decision.  Requiring the manufacturer to provide warnings directly to the consumer would interfere with the doctor-patient relationship.") (internal citations and quotation marks omitted);  Plenger v. Alza Corp., 11 Cal. App. 4th 349, 362 n.6 (1992) ("The rationale of the [learned intermediary doctrine] is: (1) The doctor is intended to be an intervening party in the full sense of the word.  Medical ethics as well as medical practice dictate [that physicians exercise] independent judgment, unaffected by the manufacturer's control, on the part of the doctor.  (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life.  (3) It would be virtually impossible for a manufacturer to comply

|  | : |  |
|---|---|---|
| Initials of Preparer | | PMC |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|---|---|---|---|
| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. | | |

with the duty of direct warning, as there is no sure way to reach the patient.") (internal citations and quotation marks omitted).

Plaintiffs do not dispute that each of the relevant jurisdictions recognizes the learned intermediary doctrine applies to failure to warn claims sounding in tort.[3]  Instead, they argue that the doctrine does not apply to the various consumer protection claims at issue in this suit.

The Court has not found, nor have the parties have identified, any case from the Supreme Court, or appeals courts, of the relevant jurisdictions that have specifically addressed the issue of whether the learned intermediary doctrine applies to the relevant consumer protection statutes at issue.[4]   When a case raises an issue of first impression, a court sitting in diversity "must use its best judgment to predict how the [relevant state] Supreme Court would decide the issue."  Burlington Ins. Co. v. Oceanic Design & Const., Inc., 383 F.3d 940, 944 (9th Cir. 2004) (internal citations, quotation marks, and alterations omitted).  "In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions."  Id. (internal citations and quotation marks omitted).

Every case that this Court has found, and that the parties have identified, that has specifically addressed the questions has found that the learned intermediary doctrine applies to consumer protection claims predicated on a failure to warn.  As one court has explained, "[i]f the doctrine could be avoided by casting what is essentially a failure to warn claim under a different cause of action such as violation of the [state law consumer protection act] or a claim for misrepresentation, then the doctrine would be rendered meaningless."  In re Norplant Contraceptive Products Liab. Litig., 955 F. Supp. 700, 709 (E.D.

---

[3] See Cottam, 436 Mass. at 322 ("This court has already recognized the learned intermediary doctrine in the context of prescription drug manufacturers."); Carlin v. Superior Court, 13 Cal. 4th 1104, 1116, 920 P.2d 1347, 1354 (1996) ("Moreover, in the case of prescription drugs, the duty to warn runs *to the physician,* not to the patient.");  Banker v. Hoehn, 278 A.D.2d 720, 721, 718 N.Y.S.2d 438, 440 (2000) ("Under the doctrine of 'learned intermediary', the manufacturer of the [prescription drug] satisfies its duty to warn of potential adverse effects when it adequately warns medical professionals who use the device in the treatment of patients."); Doe v. Alpha Therapeutic Corp., 3 S.W.3d 404, 419 (Mo. Ct. App. 1999) ("Missouri courts adhere to the learned intermediary doctrine.").

[4] Defendant has identified one unpublished case from a Massachusetts trial court that appears to apply the learned intermediary doctrine to claims brought under Massachusetts' consumer protection law.  See Linnen v. A.H. Robins Co., Inc., 2000 WL 89379, at *6 (Mass. Super. Dec. 14, 1999).

| | : | |
|---|---|---|
| Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|----------|----------------------|------|---------------|

| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. |
|-------|---------------------------------------------------|

Tex. 1997) aff'd sub nom. In re Norplant Contraceptive Products Litig., 165 F.3d 374 (5th Cir. 1999)[5]; see also Scelta v. Boehringer Ingelheim Pharmaceuticals, Inc., 404 F. App'x 92, 94 (8th Cir. 2010) (noting that the "parties agree" that if the plaintiff's prescribing physician knew of a prescription drug's risk, the "learned intermediary doctrine prevents [the plaintiff[ from proving that the [defendant drug manufacturer's] alleged deception proximately caused his injuries" under Florida's consumer protection laws); Kee v. Zimmer, Inc., 871 F. Supp. 2d 405, 411 (E.D. Pa. 2012) ("[A] private right of action under [Pennsylvania's consumer protection act] requires proof of justifiable reliance and causation, and such requirements cannot be present when the defendant is a pharmaceutical company that did not sell its product directly to the patient."); Beale v. Biomet, Inc., 492 F. Supp. 2d 1360, 1372 (S.D. Fla. 2007) ("[F]ederal courts in jurisdictions across the country, including Florida, have held that the learned intermediary doctrine encompasses all claims based upon a pharmaceutical manufacturer's failure to warn, including claims for fraud, misrepresentation, and violation of state consumer protection laws.").[6]

Indeed, federal district courts that have considered two of the consumer protection claims at issue in this case—Missouri and New York—have concluded that the learned intermediary doctrine applies to those claims. See Carr-Davis v. Bristol-Myers Squibb Co., 2013 WL 322616, at *4-*5 (D.N.J. Jan. 28, 2013) (applying the learned intermediary doctrine to claims brought under Missouri's Merchandising Practices Act based on an interpretation of Missouri law, where the claims at issue "essentially turn[ed] on whether Defendants adequately warned that [the defendant manufacturer's drug' carried a risk of bleeding complications); Colacicco v. Apotex, Inc., 432 F. Supp. 2d 514, 552 (E.D. Pa. 2006) aff'd, 521 F.3d 253 (3d Cir. 2008) cert. granted, judgment vacated, 129 S. Ct. 1578 (U.S. 2009) ("[W]e agree that the learned intermediary doctrine also precludes Plaintiff's claim under [New York's] consumer protection statute.").

---

[5] On appeal, the Fifth Circuit specifically upheld the district court's ruling that the learned intermediary doctrine applied to the Texas Deceptive Trade Practices Act. See In re Norplant Contraceptive Products Litig., 165 F.3d 374, 378 (5th Cir. 1999)

[6] Plaintiffs cite twelve cases from the relevant jurisdictions in support of their argument that the learned intermediary doctrine does not apply to the claims at issue. See Pls. Resp. to Def.'s Mot. for Summary Judgment at 14-18. Of those twelve cases, ten do not address the question at hand; one, Plubell v. Merck & Co., expressly reserved judgment on the question at hand, see 2008 WL 4771525, at *9 (Mo. Cir. June 12, 2008); and the final one appeared to apply the learned intermediary doctrine to claims brought under Massachusetts' consumer protection law. See Linnen, 2000 WL 89379, at *6.

|  | : |
|--|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|----------|----------------------|------|---------------|
| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. | | |

Thus, the Court concurs with the great weight of authority and concludes that the learned intermediary doctrine applies to the consumer protection claims at issue.

**B. Application of the Doctrine to this Case**

In order to prevail to prevail on its defense, Defendant must establish that it adequately warned prescribing physicians of the effects of Cymbalta withdrawal.  See, e.g. Carlin, 13 Cal. 4th at 1116 ("In the case of medical prescriptions, if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed.") (internal citations and quotation marks omitted).  Generally, the question of whether a warning was adequate is a question of fact.  See, e.g.  In re Meridia Products Liab. Litig., 328 F. Supp. 2d 791, 812 (N.D. Ohio 2004) aff'd sub nom. Meridia Products Liab. Litig. v. Abbott Laboratories, 447 F.3d 861 (6th Cir. 2006) ("Generally, whether a particular warning is 'adequate' is a question of fact to be resolved by a jury."); see also Carlin v. Superior Court, 13 Cal. 4th 1104, 1116, 920 P.2d 1347, 1353 (1996) (noting that determining whether a warning is adequate is a question of fact, involving "inter alia, questions concerning . . . what was known or reasonably knowable by the application of scientific and medical knowledge available at the time of manufacture . . . [and] questions concerning whether the risk, in light of accepted scientific norms, was more than merely speculative or conjectural . . . .").  At a minimum, Plaintiffs are entitled to additional discovery necessary to demonstrate whether the warnings provided in this case were "adequate."

**III. CLASS CERTIFICATION**

However, even if this Court, or a fact-finder, concludes that the warnings give were inadequate, Plaintiffs would still be required to prove that "the inadequacy or absence of the warning caused the plaintiff's injury." Motus, 196 F. Supp. 2d at 991.[7]  In order to determine whether or not the warnings at

---

[7] Indeed, Plaintiffs would be required to prove causation as to each cause of action asserted, regardless of whether the learned intermediary doctrine applied. See Bower v. AT & T Mobility, LLC, 196 Cal. App. 4th 1545, 1556 (2011) ("Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof."); Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 326 (2011) ("[California law] requires that a plaintiff's economic injury come 'as a result of' the unfair competition [UCL] or a violation of the false advertising law [Section 17500].");  Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013) (noting that in order to recover under Massachusetts' Chapter 93A, it is an "established principle" that "a plaintiff must prove causation"); Stutman v. Chem. Bank, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 612 (2000) (noting that, in order to recover under New York's consumer protection laws, a plaintiff "must show that the defendant's 'material deceptive act' caused the

| | | : | |
|---|---|---|---|
| Initials of Preparer | | PMC | |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|----------|----------------------|------|---------------|

| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. |
|-------|----------------------------------------------------|

issue caused the Plaintiffs' injuries, this Court, or a fact-finder, would be required to engage in a series of individualized assessments.  Among other things, this Court would need to determine whether: 1) if the individual plaintiff had known about the severity, duration, and extent of Cymbalta withdrawal, would she or he still have taken the medication?; 2) if the individual plaintiff's physician had known about the relevant side-effects, would the physician still have recommended and prescribed Cymbalta?; 3) did the individual plaintiff's physician know of the side effects from a source other than the warning label, and prescribe Cymbalta even with this knowledge?  In the context of prescription drugs, each of these determinations will necessarily be different.  See, e.g. Plummer, 819 F.2d at 356 ("Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect.  As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers.  The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.") (internal citations and quotation marks omitted).

Class certification may not be granted unless "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Although the question of whether or not the warnings given to doctors, and consumers, were inadequate or misleading may be capable of resolution on a class-wide basis, the question of whether or not, had the warnings been adequate, each plaintiff would not have taken Cymbalta are not.  See Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 595 (9th Cir. 2012) (vacating the district court's certification of a class because the class included "many class members were never exposed to the allegedly misleading advertisements").  Indeed, after conducting an extensive review, one district court concluded that "[t]o date, no Court of Appeals decision has approved class certification of an action involving prescription drugs."  In re Baycol Products Litig., 218 F.R.D. 197, 203-04 (D. Minn. 2003); see also  Sweet v. Pfizer, 232 F.R.D. 360, 365 (C.D. Cal. 2005) (denying class certification based on allegations that the drug manufacturer inadequately warned consumers about the side-effects based on lack of typicality and the presence of too many individualized issues); In re Paxil Litig., 212 F.R.D. 539, 551 (C.D. Cal. 2003) (denying class certification because "individual questions of fact regarding causation nevertheless subvert any benefits to be gained through a class action proceeding.  Whether, and to what extent, Paxil causes discontinuation symptoms varies from patient to patient.  Not only do individual physiologies

---

injury"); Owen v. Gen. Motors Corp., 533 F.3d 913, 922 (8th Cir. 2008) ("[T]he plain language of the [Missouri Merchandising Practices Act] demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice.").

: 

Initials of Preparer                    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:12-cv-9366-SVW-MAN | Date | June 13, 2013 |
|---|---|---|---|
| Title | Jennifer L. Saavedra, et al. v. Eli Lilly and Co. | | |

affect the causation issues, but so too do the underlying illnesses and medical history of each individual plaintiff.  In the face of such facts, denial of class certification for failing to meet the 'predominance' requirement is appropriate").

While this Court is not bound by these district court decisions, it finds that, in the interests of judicial economy, the appropriate next step is for the parties to brief the issue of class certification. Accordingly, the Court establishes the following briefing schedule:

Plaintiffs' motion for class certification . ………………………………. August 19, 2013

Defendant's opposition ……………………………………………………. August 26, 2013

Plaintiffs' reply ……………………………………………………….. September 3, 2013

Hearing ……………………………………………… September 17, 2013 at 1:30 p.m.

For purposes of the class certification motion, the parties should assume that Plaintiffs will be able to prevail on their contention that the warnings given to physicians were inadequate as alleged in the FAC.

                                                              :

Initials of Preparer                          PMC

# EXHIBIT C

1   Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
    lsarko@kellerrohrback.com
2   Michael D. Woerner, Esq., *admitted pro hac vice*
    mwoerner@kellerrohrback.com
3   Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
    gcappio@kellerrohrback.com
4   Havila Unrein, Esq., *admitted pro hac vice*
    hunrein@kellerrohrback.com
5   **KELLER ROHRBACK L.L.P.**
    1201 Third Avenue, Suite 3200
6   Seattle, WA 98101
    Telephone: (206) 623-1900 / Fax: (206) 623-3384
7
    Juli E. Farris, Esq. (CA Bar No. 141716)
8   jfarris@kellerrohrback.com
    **KELLER ROHRBACK L.L.P.**
9   1129 State Street, Suite 8
    Santa Barbara, CA 93101
10  Tel: (805) 456-1496 / Fax: (805) 456-1497

11  Mark D. Samson, Esq., *admitted pro hac vice*
    msamson@kellerrohrback.com
12  **KELLER ROHRBACK P.L.C.**
    3101 N. Central Avenue, Suite 1400
13  Phoenix, AZ 85012
    Tel: (602) 248-0088 / Fax: (602) 248-2822
14

15  ***Additional Counsel for Plaintiffs on following page***

16              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
17

18  | JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated, | **NO. 2:12-CV-09366-SVW(MANX)** CLASS ACTION |
    | --- | --- |
19  | | **DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
20  | Plaintiffs, | |
21  | vs. | **THE HONORABLE STEPHEN V. WILSON** |
22  | | |
23  | ELI LILLY AND COMPANY, an Indiana corporation, | |
24  | Defendant. | |
25
26
27
28

Samuel S. Deskin, Esq.
sam@deskinlawfirm.com
DESKIN LAW FIRM, PLC
16944 Ventura Blvd
Encino, CA 91316
Tel.:  (800) 709-8978 / Fax: (800) 709-8971

Harris L. Pogust, Esq.
hpogust@pbmattorneys.com
T. Matthew Leckman, Esq.
MLeckman@pbmattorneys.com
POGUST BRASLOW MILLROOD LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel.:  (800) 897-8930 / Fax:  (610) 941-4245

*Additional Counsel for Plaintiffs*

I, Joel Hay, Ph.D., do hereby declare and state:

1.      I have personal knowledge of the matters contained herein and, where I do not have direct knowledge, I believe them to be true and correct based upon the information available to me, my education, training, and experience.  I would testify, if called, to the matters set forth in this declaration.

2.      I am a tenured Full Professor and Founding Chair of Pharmaceutical Economics and Policy in the School of Pharmacy, with joint appointments in the Schaeffer Center for Health Policy and Economics and in the Department of Economics at the University of Southern California ("USC"). I also serve as the USC Project Coordinator for the Rand Evidence-Based Medicine Practice Centers of Southern California, funded by the U.S. Agency for Healthcare Research and Quality. I am a Health Economics Research Scholar at the UCLA Center for Pediatric Vaccine Research. I am a founding Executive Board member of the American Society for Health Economics. I am also an extramural grants reviewer for the U.S. Agency for Healthcare Research and Quality.

3.      Our academic department at USC is the largest and most prominent department in the United States focused specifically on pharmaceutical economics and health economics. Since I initiated the graduate programs in Pharmaceutical Economics and Policy in 1994, we have graduated over 100 Ph.D. and Master of Science students in this field. We currently have 32 graduate students in residence.

4.      I earned my B.A. *summa cum laude* in economics from Amherst College in 1974, and my M.A., M.Phil., and Ph.D. in economics from Yale University between 1976 and 1980. I have also taught at Yale University, Stanford University, University of California Santa Barbara, and the University of Connecticut, and I have been a tenured faculty member at USC since 1992.

5.      From 1978 to 1980, I was an Assistant Research Professor at USC. Then from 1980 to 1984, I was an Assistant Professor in the School of Dental

Medicine and the Department of Economics at the University of Connecticut. After that I was a Senior Policy Analyst with Project Hope from 1983 to 1985. Then from 1985 to 1992, I was a Senior Research Fellow at the Hoover Institution at Stanford University.

6.      I have authored or coauthored over 450 scientific reports, articles and abstracts, including 160 peer-reviewed scientific articles in the fields of pharmaceutical economics, health economics, health care markets, outcomes research, disease management, statistics, econometrics, epidemiology and health care in journals including: *American Journal of Cardiology, American Journal of Managed Care, American Journal of Public Health, Archives of Neurology, Haemophilia, Health Care Financing Review, Health Affairs, Health Economics, Health Policy, JAMA, Journal of AIDS, Journal of the American Geriatrics Society, Journal of Business & Economic Statistics, Journal of Clinical Gastroenterology, Journal of Health Economics, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of the Royal Statistical Association, Medical Care, Pediatrics, Pharmacoepidemiology & Drug Safety, Psychiatric Services* and *Value in Health.*

7.      I have served as a consultant to U.S. Centers for Medicare and Medicaid Services, U.S. Agency for Healthcare Research and Quality, U.S. Centers for Disease Control and Prevention, U.S. Public Health Service, U.S. Food and Drug Administration, U.S. Environmental Protection Agency, Government of Hungary, Hong Kong Centre for Economic Research, Hong Kong Medical Executives Association, World Bank, California AIDS Commission, California Medi-Cal Drug Advisory Board, County of San Diego Medically Indigent Adult Program and County of Sacramento Homeless Program.

8.      I have also written numerous health care-related op-eds published in papers such as the Los Angeles Times, New York Times, Wall Street Journal, San

Francisco Chronicle, San Diego Union, Sacramento Bee and Newsday. I have been interviewed numerous times on television and radio regarding health-related and drug-related policy issues, including media networks such as PBS, CBS, ABC, NBC, Fox News, C-SPAN and Air America.

9.     I have served as a member of the Expert Advisory Panel on Drug Utilization Review, United States Pharmacopeial Convention, as an Executive Committee member for the federally sponsored Southern California Evidence-Based Medicine Practice Center, and as a member of the JAMA Web Site HIV/AIDS Editorial Review Panel. I am a founding member of the Board of Directors of the International Society for Pharmacoeconomics and Outcomes Research.

10.     I served as the Founding Editor-in-Chief of Value in Health, the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research, from its 1998 inception until 2003. In its first scientific citation impact factor, Value in Health was ranked number one in two categories for the year 2004 by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. Value in Health led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition. These categories include all journals relating to health economics and pharmaceutical economics.

11.     I have also provided legal expert reports and testimony in several damage and injury cases relating to pharmaceutical and medical issues.  A more complete listing of my qualifications and publications is outlined on my *curriculum vitae*, which is attached as Exhibit A.

12.     I have been retained by counsel for Plaintiffs Jennifer L. Saavedra, Dr. Melissa Strafford, Carol Jacquez, and David Matthews, Jr. as an expert in this matter.  I was asked to explain how one would develop an economic damages

calculation methodology to measure and quantify the economic damage to the putative class as a result of alleged wrongful conduct by Defendant Eli Lilly and Company.

13.    I was asked to provide my opinion about how Plaintiffs could quantify the market's increased willingness to pay for a drug based on allegedly omitted characteristics regarding withdrawal risks and, correspondingly, the amount of money consumers in the four relevant states allegedly overpaid for Cymbalta because of the omitted risk information.

**Calculating the Market's Willingness to Pay and the Amount of Money Consumers in California, Missouri, New York, and Massachusetts Spent on Cymbalta Prescriptions Because Information about Cymbalta's Withdrawal Risk Was Omitted from its Label and Marketing**

14.    For Plaintiff's theory of damages, I was asked to determine how one could ascertain the amount consumers paid for Cymbalta because the product was allegedly marketed without disclosing its risk of causing physical dependence and withdrawal, or as an alternative, how much additional Cymbalta was sold in the marketplace because this information was allegedly omitted.  In essence, Plaintiff would like to know if it is possible, using valid survey and statistical techniques, to ascertain what value consumers and physicians place on the information about Cymbalta's withdrawal risks.

15.    It my opinion, it would be possible and scientifically valid to ascertain the value consumers and physicians place on the withdrawal risk information at issue here using conjoint survey analysis.[1]

---

[1] I have substantial experience and expertise in conducting conjoint analysis surveys among prescribing physicians and in evaluating treatment preferences for patients with depression.  I have worked on these various publications involving conjoint analysis (I have put my name first to indicate my involvement, although I was not necessarily the first author): Joel W. Hay et al, *Using Conjoint Analysis to Assess Depression Treatment Preferences among Low-Income Latinos*, 55 PSYCHIATRIC SERVICES 8, 934-37 (2004); Joel W. Hay, *Effectiveness of Collaborative Care in Addressing Depression Treatment Preferences Among Low-Income Latinos*, 61 PSYCHIATRIC SERVICES 11, 1112 – 18 (2010); Joel W.

16.     Conjoint ("**con**sider **joint**ly") analysis is a type of survey market research that has been used by researchers for over four decades to determine how consumers place value on specific attributes of products, often called the market's willingness to pay ("MWTP").  Since it was first introduced in the early 1970s, conjoint analysis has become the most widely used technique in quantitative marketing research.  In the healthcare sector, conjoint analysis uses a systematic approach to efficiently assess treatment preferences and how these preferences are altered by differences in treatment efficacy and adverse effects.

17.     Conjoint analysis emerged in response to the failure of prior methodologies to determine accurately the MWTP for particular product attributes.  Research has shown that simply asking consumers what they are willing to pay for a particular attribute is inaccurate, due to a variety of psychological factors that weigh into how consumers provide answers to questions about the valuation of a product.  Conjoint analysis, however, avoids these pitfalls by tapping into a basic aspect of human psychology, namely, that consumers make relational choices about products based upon the product's features and functionality.  Accordingly, conjoint analysis conceptualizes products as bundles of attributes, such as price, to compare how a consumer values particular aspects of a product over others.  Using specialized consumer surveys, conjoint analysis forces consumers to make trade-offs over attributes, which allows researchers to see how consumers comparatively value a particular aspect of a product.  In other words, it examines how consumers "consider jointly" the various aspects of a product.

18.     Conjoint analysis is particularly suited to ascertaining damages in cases involving the value created, or lost, because of a particular feature or

Hay et al, *Depression Treatment Preferences of Older White and Mexican American Men*, 35 GEN. HOSPITAL PSYCH. 1,  59-65 (2013); Joel W. Hay, *Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing*,  Podium Presentation, Health Care Applications: Sawtooth Software Conference, October, 2013, Dana Point, CA.

attribute in the context of litigation.  Since conjoint analysis uses advanced quantitative statistics to predict and dissect market behavior, it avoids the problem of what individual consumers "would have done" and, instead, uses statistics to evaluate *common* market behavior.  For example, it would be difficult to use conjoint analysis to predict how a specific consumer would value a specific attribute.  Indeed, predictive statistics are typically not designed to predict individual action.  Instead, conjoint analysis predicts how, on average, all consumers value a particular attribute.  This is important in the context of marketing a product because, generally, promotional activities and representations about a product are not made individually, but are directed to the entire consumer base.  Thus, companies are generally concerned with common market behaviors and how specific marketing efforts will, on average, affect sales.  The results of a conjoint analysis, while driven by data collected on an individual level, allow researchers to ascertain how specific product attributes drive the marketplace's valuation of a product, which, in turn, allows researchers to evaluate how that attribute affects sales.

19.    In the context of prescription medication, conjoint analysis can be used to ascertain how consumers and physicians value particular aspects of a drug. *See, e.g.*, Joel W. Hay, Conjoint Analysis in Pharmaceutical Research, 8 J. MANAGED CARE PHARMACY 3, 206-08 (2002) ("There are a number of important pharmacy and pharmaceutical research questions that naturally suggest conjoint analysis as a valuable research methodology. These include new drug development, drug benefit program design, drug treatment willingness-to-pay assessment, and medication cost effectiveness research."); Joel W. Hay et al, *Development and validation of a grading system for the quality of cost-effectiveness studies*,  41 MED. CARE 1, 32044 (Jan. 2003); Gang Xu & Yilian Tuan, *Conjoint analysis in pharmaceutical marketing research*, QUIRK'S

MARKETING RESEARCH R. (2001) ("Conjoint analysis is a technique that evaluates the importance of a product's attributes to consumers.  For a pharmaceutical product such as a drug, its attributes may include price, dosing, efficacy, and side effects, among others.  Conjoint analysis is used to examine how consumers' perceptions of these attributes influence their preference of the products.").  Indeed, conjoint analysis is best suited for markets where there are a variety of competitors in the marketplace.  In the context of Cymbalta and other serotonin-norepinephrine reuptake inhibitors (SNRIs) and selective serotonin reuptake inhibitors (SSRIs), there is a robust marketplace of competing antidepressants, including, *inter alia*, Prozac, Paxil, Celexa, Lexapro, Zoloft, Effexor, and Pristiq.  Because Cymbalta is also approved to treat chronic pain and fibromyalgia, other marketplace competitors are non-steroidal anti-inflammatory drugs such as ibuprofen and Celebrex, as well as pain medications such as Percocet, Vicodin, Savella, and Lyrica.  In determining how consumers and physicians valuate which products they purchase or prescribe, conjoint analysis is particularly suited.

20.     Using conjoint analysis to ascertain how much consumers and physicians, as a marketplace, value withdrawal risk information will require several phases.  The first phase will entail generating an appropriate list of attributes that will be the subject of the analysis.  The goal, here, will be to isolate the most important characteristics of antidepressants and pain relievers that consumers and physicians consider before deciding whether to purchase or prescribe a drug.  The generation of a list of attributes will require interviewing physicians and patients, examining those attributes that are already marketed by pharmaceutical companies, and characterizing those attributes in ways that are conducive to a conjoint analysis.  Indeed, it may prove valuable to convene a focus group of experts in the field to see what common attributes of antidepressants are important.  Such qualitative methods in generating attribute lists for conjoint

analysis is common.  Some of the important considerations will include:  (1) avoiding attributes that are nearly universally present in all drugs, since such attributes are unlikely to be a basis for customer choice; (2) avoiding attributes that are nearly universally absent, since such attributes are unlikely to be a basis for customer choice; (3) avoiding attributes that have substantial variation such that there are numerous potential values, since a phenomenon known as "number of levels effect" in conjoint analysis can overstate a particular attribute's significance; (4) avoiding attributes that involve other types of products, like antipsychotics or other non-SSRI based drugs; and (5) avoiding attributes that are too complicated for the survey population.  It will also be important to determine how the attribute levels will be characterized to allow for conjoint surveying.

21.    Since the process of determining which antidepressant a consumer will purchase is influenced by the physician's decision-making process—in fact, the consumer cannot purchase a prescription medication without a doctor's authorization—in order to sufficiently establish the MWTP, it is important to survey both consumers and physicians and to tailor the conjoint analysis for both groups.  Thus, it is possible that the list of attributes for consumers may be different than the list of attributes created for the physicians.  This is particularly true since the list of attributes for physicians may be substantially more sophisticated in light of their advanced training.  It may also be worthwhile to consider the responses of third-party payors and formulary committee members, since consumers' choices are influenced by which drugs are covered by their insurance policies.  However, patients are ultimately the ones who decide to purchase or refill their prescriptions.  Although prescription drug choice represents a complex decision-making process, discrete choice analysis is very flexible and can be tailored accordingly.

22.     By generating a list of material attributes that consumers and physicians consider before purchasing or prescribing an antidepressant or pain reliever, I will be able to craft surveys designed to isolate how the market values a drug's likelihood to cause withdrawal.  For instance, by holding all attributes constant, I could isolate what the MWTP is for an antidepressant with a withdrawal risk of 1% versus an antidepressant with a withdrawal risk of 44%.  I could, similarly, ascertain the MWTP for a drug that causes moderate to severe withdrawal in 63% of users versus a drug that causes moderate to severe withdrawal in 18% of users.  These, however, are simply hypothetical approaches to the conjoint analysis.  Any and all questions or approaches will be governed by the results of the first phase.

23.     After generating the appropriate attribute list, I would need to design a proper questionnaire and select a type of conjoint analysis that best suits the issue of a drug's withdrawal risk.  There are various approaches I would consider in developing my conjoint survey and data collection.   The first option I would consider would involve using a full-profile technique.  Full-profile techniques have each survey respondent, here consumers and physicians, place a value on every attribute.  This is done using a variety of sampling methods, for instance, using: (1) a rating scale: where respondents rate the importance of each attribute on a specified gradation scale; (2) a constant sum scale: where respondents are asked to allocated 100 points among specific attributes, giving more points to those attributes they feel are most important; or (3) a maximum difference scale: where respondents pick the most important and least important attribute.  In addition, I could employ a self-explicated preference-data collection, such as Adaptive Self-Explication of Multi-Attribute Preferences, where respondents use a combination of ranking methods followed by comparative value assessments between comparable attributes.   I would similarly consider hybrid techniques, such as

adaptive conjoint analysis, where each respondent performs a self-explicated task which, in turn, automatically generates specific product choice questions designed to ascertain how, based upon the respondent's stated preferences, those preferences manifest in a decision-making context.  Since conjoint surveys are implemented as web-based surveys, implementing a conjoint survey is relatively simple and allows for a variety of data-structure options.

24.    After I had developed a conjoint survey that could accurately evaluate how consumers and physicians value the probability that a drug will cause withdrawal, the next step would require conducting the survey itself.   This step requires ensuring there is no sampling bias in the subjects to be surveyed (i.e., that the characteristics of the sample reflect the characteristics of the relevant population) and that there is a sufficient number of respondents to give the conjoint analysis statistical power and precision.

25.    The final phase would be to untangle and evaluate the data collected through the conjoint survey.  Specifically, I would need to evaluate how the "withdrawal risk" attribute played into the decision-making process of consumers and physicians.  This result could yield two possible, analytically independent, metrics that could be used to ascertain the damages at issue here.  First, using conjoint analysis I could determine how much the "withdrawal risk" was valued by consumers and physicians.  This value would be determined using a pricing attribute as part of the conjoint analysis that would allow me to calculate, on average, what the "withdrawal risk" value was for each purchase, either in absolute or percentage terms.  Second, and in the alternative, I could use the conjoint survey to evaluate the consumer's and physician's willingness to pay / prescribe a drug with the "withdrawal risk" attribute applicable to Cymbalta, to determine how much additional Cymbalta was sold as a result of suppressing the "withdrawal risk" attribute from the market.  Each of these metrics would independently allow

me to calculate an amount of damages that were sustained by the marketplace as a result of the consumer protection violations alleged by Plaintiffs.

26.     In sum, it is my opinion that, should this matter be certified as a class, I would be able to ascertain through a conjoint analysis survey how much money consumers within California, Missouri, New York, and Massachusetts spent out-of-pocket on Cymbalta between 2004 and the present as a direct result of Lilly allegedly withholding the withdrawal risk information at issue.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 16, 2013.

_Joel Hay_

_____

Dr. Joel W. Hay

# EXHIBIT D

1  Lynn Lincoln Sarko, Esq., *admitted pro hac vice*
   lsarko@kellerrohrback.com
2  Michael D. Woerner, Esq., *admitted pro hac vice*
   mwoerner@kellerrohrback.com
3  Gretchen Freeman Cappio, Esq., *admitted pro hac vice*
   gcappio@kellerrohrback.com
4  Havila Unrein, Esq., *admitted pro hac vice*
   hunrein@kellerrohrback.com
5  **KELLER ROHRBACK L.L.P.**
   1201 Third Avenue, Suite 3200
6  Seattle, WA 98101
   Telephone: (206) 623-1900 / Fax: (206) 623-3384
7
8  Juli E. Farris, Esq. (CA Bar No. 141716)
   jfarris@kellerrohrback.com
   **KELLER ROHRBACK L.L.P.**
9  1129 State Street, Suite 8
   Santa Barbara, CA 93101
10 Tel: (805) 456-1496 / Fax: (805) 456-1497

11 Mark D. Samson, Esq., *admitted pro hac vice*
   msamson@kellerrohrback.com
12 **KELLER ROHRBACK P.L.C.**
   3101 N. Central Avenue, Suite 1400
13 Phoenix, AZ 85012
   Tel: (602) 248-0088 / Fax: (602) 248-2822
14
15 ***Additional Counsel for Plaintiffs on following page***

16              **UNITED STATES DISTRICT COURT**
17              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 18  JENNIFER L. SAAVEDRA, DR. MELISSA STRAFFORD, CAROL JACQUEZ, and DAVID MATTHEWS, JR., on behalf of themselves and all other persons similarly situated, | **No. 2:12-CV-09366-SVW(MANx)** <u>**CLASS ACTION**</u> |
| Plaintiffs, | **DECLARATION OF DR. JOEL W. HAY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| ELI LILLY AND COMPANY, an Indiana corporation, | |
| Defendant. | **Date:  November 4, 2013** <br> **Time:  1:30 p.m.** <br> **Location:  Courtroom 6** <br> **Judge:  Hon. Stephen V. Wilson** |

Samuel S. Deskin, Esq.
sam@deskinlawfirm.com
DESKIN LAW FIRM, PLC
16944 Ventura Blvd
Encino, CA 91316
Tel.: (800) 709-8978 / Fax: (800) 709-8971

Harris L. Pogust, Esq.
hpogust@pbmattorneys.com
T. Matthew Leckman, Esq.
MLeckman@pbmattorneys.com
POGUST BRASLOW MILLROOD LLC
161 Washington Street, Suite 1520
Conshohocken, PA 19428
Tel.: (800) 897-8930 / Fax: (610) 941-4245

*Additional Counsel for Plaintiffs*

1.      I have personal knowledge of the matters contained herein and, where I do not have direct knowledge, I believe them to be true and correct based upon the information available to me, my education, training, and experience.  I would testify in person if the Court has any questions regarding the matters set forth in this declaration.

2.      I make this Supplemental Declaration in Support of Plaintiffs' Motion for Class Certification.  Prior to writing this declaration, I reviewed the transcript of oral argument on September 17, 2013, the Declaration of Ernst R. Berndt, Ph.D. (Dkt. 92), and the Declaration of Patrick Bruen (Dkt. 93).

3.      In my previous declaration, I provided an opinion about whether it would be possible, using valid statistical techniques, to create a damages model to ascertain the amount by which consumers were injured by purchasing Cymbalta which was not as represented.  I stated that I would be able to ascertain a damages calculation using conjoint analysis.

4.      As I explained in my previous declaration, conjoint analysis is a statistical technique used in market research to objectively ascertain how much consumers value specific attributes of a product.  Using the power of sampling and statistics as a whole, conjoint analysis allows researchers to examine what drives consumer behavior and determine, on a market-wide (i.e., class-wide) level, how consumers value specific attributes of a product.

5.      This method of research and analysis has been widely used since the 1970s and has been specifically used in the pharmaceutical context since the 1990s.[1]   Indeed, Defendant Eli Lilly & Co. ("Lilly") has used conjoint analysis in

---

[1] *See, e.g.*, Stuart Eriksen and L. Robin Keller, *A Multiattribute-utility-function Approach to Weighing the Risks and Benefits of Pharmaceutical Agents*, Medical Decision Making 1993: 13(116-125); Mike Aristides et al., *Conjoint Analysis of a New Chemotherapy: Willingness to Pay and Preference for the Features of Raltitrexed versus Standard Therapy in Advanced Colorectal Cancer*, Pharmacoeconomics 2002; 20 (11):775-784; Michael Aristides et al., *Patient Preference and Willingness-to-Pay for Humalog Mix25 Relative to Humulin*

evaluating its pharmaceutical products. *See* Ex. 3, Michael Aristides et al., *Patient Preference and Willingness-to-Pay for Humalog Mix25 Relative to Humulin 30/70: A Multicountry Application of a Discrete Choice Experiment*, Value in Health 2004: 7(4):442-454.

6.     In my previous declaration I explained how I would conduct a conjoint analysis survey and how the results of that survey would allow me to calculate damages for the purposed classes. I explained that:

> The final phase would be to untangle and evaluate the data collected through the conjoint survey. Specifically, I would need to evaluate how the "withdrawal risk" attribute played into the decision-making process of consumers and physicians. . . . [U]sing conjoint analysis I could determine how much the "withdrawal risk" was valued by consumers and physicians. This value would be determined using a pricing attribute as part of the conjoint analysis that would allow me to calculate, on average, what the "withdrawal risk" value was for each purchase, either in absolute or percentage terms. . . [T]hese metrics would independently allow me to calculate an amount of damages that were sustained by the marketplace as a result of the consumer protection violations alleged by Plaintiffs.

(Declaration of Dr. Joel W. Hay at ¶ 25, Dkt. 83.)

7.     During the oral argument on September 17, 2013, the Court asked questions about whether my proposed analysis would be able to ascertain the value of a particular attribute of a drug, and whether that value could be used to calculate a damages amount. Because my previous declaration did not fully elaborate upon how the *value* of an attribute would translate into a specific *damages* calculation. I will do so here.

---

*30/70: A Multicountry Application of a Discrete Choice Experiment*, Value in Health 2004: 7(4):442-454; Gunnar Johansson et al., *Asthma Treatment Preference Study: A Conjoint Analysis of Preferred Drug Treatments*, CHEST 2004; 125:916–923; Andrew Lloyd et al., *The Importance of Drug Adverse Effects Compared with Seizure Control for People with Epilepsy A Discrete Choice Experiment*, Pharmacoeconomics 2005; 23 (11):1167-1181. Attached as Exhibits 1 – 5.

8.     To begin, it is important to establish what I mean by the term "value." In economic terms, the value of a product is a *measure* of the benefit a typical consumer believes they will obtain by use or ownership of the product. Frequently, economists measure value in terms of dollars and consider the value of a product to be the market's willingness to pay ("MWTP") for an item.  MWTP is an objective measurement that allows economists to confidently determine what a product is worth for a given subject population.

9.     Take the Court's car hypothetical as an example.  If a person is willing to pay, at most, $10,000 for a car, then one could say that the consumer values the car at $10,000.  Because value is a measure, however, value can be described using non-monetary determinants.  For instance, the value of a product could be determined relative to other objects or conditions.  One could describe the consumer's value of the product relationally.  The consumer could consider that a car is five times more valuable than a motorcycle.  In that case, one could say that the consumer values the car at five motorcycles.

10.     Similarly, one could describe value in the context of an attribute.  To follow the Court's automobile hypothetical, a consumer could value a car with a high-end battery 3% more than a car with an aftermarket battery.  Likewise, a consumer could value a car with a 7-year battery 2% more than a car with a 3-year battery.  In either case, the value of the product or the attribute is described in terms of a measure of what the consumer believes it is worth to him or her.  Simply stated, whether one talks about the product as a whole or a specific attribute of the product, value reflects a measure of desirability.

11.     Conceptually and practically, value is different than price.  Price is determined by the seller, whereas value is determined by the buyer. The consumer only purchases an item if the "value" to the consumer is equal to or greater than the transactions price. In a competitive and transparent market, the price of a product is

the intersection of the supply and demand curve and very closely approximates the MWTP. However, in the brand name pharmaecutial market, price and value often diverge because of market constraints and regulatory factors.

12.     In the car battery hypothetical, it does not matter what price the consumer ultimately paid at the car dealership, whether the dealer is holding a sale, or whether the dealer has raised prices because location rent or employee health insurance premiums increased. Conjoint analysis allows the researcher to determine the value of the high-end car battery to the consumer objectively, so that regardless of the particular circumstances of each consumer's purchase, the aggregate value of the attribute—the high-end battery—is represented as MWTP.

13.     In the car hypothetical, this MWTP may closely approximate market prices, because the market for cars, while not perfectly efficient, is a fairly efficient, competitive market. By contrast, the prescription drug market is subject to demand and supply regulations and constraints that substantially weaken the relationship between transaction price and value.[2] In the context of a patent-protected drug like Cymbalta, because the relevant treatments typically possess some market power, the relationship between price and value is even more complex. While typically there is some relationship between a prescription drug's value and its price, the drug's price does not perfectly reflect its value. In this context, therefore, using multi-criteria decision analysis actually is a more direct and reliable way to measure in financial terms the difference between the product with and without the attribute in question.

---

[2] As I wrote in 2005, ".., healthcare markets are heavily regulated, licensed, credentialed, and restricted. In every country, healthcare satisfies few of the Economics 101 criteria for free market competition. Under these circumstances, the "invisible hand" ensuring that scarce medical resources are being produced or consumed efficiently is severely atrophied and arthritic." Hay JW. "Application of Cost Effectiveness and Cost Benefit Analysis to Pharmaceuticals." Chapter 14 in Santoro M, Gorrie T, eds. The Grand Bargain: Ethics and the Pharmaceutical Industry in the 21st Century. Cambridge University Press, New York NY, 2005:225-248.

14. Turning to Cymbalta, Plaintiffs allege that Lilly withheld material information from everyone – consumers and their prescribers alike – about the risks of withdrawal and misrepresented that withdrawal rates occur at rate greater than or equal to 1% when studies show the risk rate was at least 44%. The injury at issue, therefore, is that every consumer purchased Cymbalta that was not the same product as Lilly represented. What Plaintiffs have asked me to do is determine on a classwide basis (or to typical consumers) what damages are associated with that injury.

15. In a perfectly competitive market, using price would be a simple way to approximate damages. In such a market, price is equal to value. Therefore, simply determining what the price of the drug would have been absent the misrepresentation and subtracting that from the price actually paid, would yield a measure of injury, i.e., overvaluation. Here, however, because of the nature of the prescription drug market and because Cymbalta is still on patent, using price as a proxy for value is not appropriate. In this instance, using statistical analysis to directly measure value in the aggregate is more suitable than using price as a proxy for value.

16. To calculate damages, therefore, I will need to determine the relative value to consumers of both high (44%) and low (1%) levels of withdrawal risk compared to other Cymbalta attributes.

17. I propose conducting a conjoint survey to determine the value of the withdrawal risk attributes. My analysis would involve the following steps.

A. First, I will generate a list of attributes for Cymbalta based on discussion with one or more patient focus groups. This initial step will allow me to identify the attributes most important to consumers in their treatment decisions. Because of the focus of this case, one of those attributes will be the risk of withdrawal.

B.     The second step is to design the conjoint analysis survey.  While the precise configuration of attributes depends on the results of the initial focus group findings, it is likely that the conjoint study would contain 5-7 attributes.  Each attribute will have 2-4 levels.  For example, the attribute of withdrawal risk will be represented in a low, medium, and high percentage.  These attributes and levels will be combined into choice combination profiles.  Because 7 attributes with 4 levels would yield 16,384 choice profiles, a fractional factorial design will be used to effectively represent the various choice profiles without overwhelming survey respondents with thousands of repeated choice tasks to fully assess preferences across all attributes and levels.  Fractional factorial designs can be used to efficiently generate statistically valid estimates generally using less than 100 subjects and requiring these subjects to consider only 8-12 choice profiles each.[3] This fractional factorial design will be generated by SPSS, Sawtooth or other computer conjoint survey software.

C.     Next, I will conduct the conjoint survey, asking a random sample of patients to make decisions about various hypothetical drugs based upon specific attributes.  This will be done using a computer-generated survey.

D.     The final step after I have collected sufficient data is to use statistical modeling to assign relative percentages to the various attributes.  These percentages will show how Cymbalta is valued by consumers according to each attribute, including how consumers value the risk of withdrawal.

18.     Using the above conjoint analysis, the economic loss suffered by each consumer of Cymbalta can then be computed in an objective, common manner.  The relative value measured by the conjoint analysis can be expressed in absolute terms or as a percentage (ratio).

---

[3] For conjoint analysis statistical power calculations, see Jordan J. Louviere, David A. Hensher, Joffre D. Swait. Stated Choice Methods Analysis and Applications, Cambridge University Press, New York, 2003; pp. 262-64.

19.     In absolute terms, the conjoint analysis will determine the dollar amount that consumers are willing to pay for a particular attribute (i.e., the MWTP).  Damages for each consumer would then be that amount up to the amount of their actual out-of-pocket expenses.

20.     Alternatively, the relative value determined through conjoint analysis can be expressed as a percentage, yielding a refund ratio.  This refund ratio would then be applied uniformly to each class member's total out-of-pocket expenses.

21.     To illustrate how a refund ratio could work, I will use Plaintiff Jennifer Saavedra as an example.  Assume that my conjoint survey indicates that the relative value of a 1% versus 44% withdrawal risk is 30% of the total product value.  This percentage indicates that, on average, by concealing the risk of withdrawal from consumers, Lilly was able to inflate the value as perceived by typical consumers of Cymbalta by 30%.  Thus, to calculate her damages, one would simply apply that refund ratio to the amount of money she paid out of pocket for Cymbalta.  According to her declaration, Plaintiff Saavedra spent $455.00 of her own money on Cymbalta.  Her refund, therefore, would be $136.50, i.e., 30% of the money she spent out of pocket.

22.     Either of these approaches is economically valid, but it is too early in the process (i.e., conjoint analysis has not yet been performed) to determine whether one method would be superior to the other.

23.     Using conjoint analysis avoids the problems of trying to isolate how Lilly's concealment of withdrawal risks affected the price each consumer paid. This approach uses valid statistical methods to create a workable damages model that addresses the injury each consumer sustained by purchasing a product that was materially different from the product as represented.  Since this approach uses a conjoint survey, it also avoids the trappings of individual issues.  Instead of trying to figure out what each consumer believed his or her valuation of Cymbalta's

1  withdrawal risk was—something that would be difficult to objectively determine
2  due to inherent bias caused by asking an individual to value an attribute directly—
3  conjoint analysis gives us insight into common and systematic market behavior and
4  allows me to determine a refund ratio that captures the damage caused to all
5  consumers by Lilly's conduct.

6      24.    Lilly has not offered any expert testimony to rebut my testimony
7  about conjoint analysis. Instead, Lilly has put forward the declarations of Dr.
8  Ernst R. Berndt of the Massachusetts Institute of Technology and an employee of
9  Lilly named Patrick Bruen. I am familiar with Dr. Berndt and his work, although I
10  am not familiar with Mr. Bruen. Both Dr. Berndt and Mr. Bruen spend a
11  considerable amount of time discussing their understanding of how the price that a
12  consumer pays for a particular drug varies. Although I have not been asked to
13  dispute or verify the contents of these declarations, I believe a general observation
14  is warranted. Respectfully, both of these declarations do not bear upon my opinion
15  whatsoever. Their analyses focus exclusively on whether there is a uniform price
16  paid by consumers for Cymbalta. They discuss at length the various ways
17  prescription drugs make their way from Lilly's factory to the consumer's hand.
18  They do not, however, touch on the issues of value or whether the concealed risk
19  of withdrawal would influence consumer perception of the drug.

20      I declare under penalty of perjury under the laws of the United States that
21  the foregoing is true and correct.

23      EXECUTED this 21st day of October, 2013, at Los Angeles, California.

25
26  Dr. Joel W. Hay

# EXHIBIT E

# Submitted Under Seal

# EXHIBIT F

# Submitted Under Seal